**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| STEPHANIE TURNER, on behalf of herself and all others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No.: |
| McDONALD'S USA, LLC, a Delaware limited liability company, and McDONALD'S CORPORATION, a Delaware corporation, | ) ) ) ) | Jury Trial Demanded |
| Defendants. | ) ) ) | |

**CLASS ACTION COMPLAINT**

# TABLE OF CONTENTS

*Page*

NATURE OF THE ACTION ................................................................................. 2

THE PARTIES.................................................................................................... 7

JURISDICTION AND VENUE ............................................................................ 9

FACTS COMMON TO ALL COUNTS................................................................ 10

    A.    The McDonald's Model: "Freedom Within A Framework"..............10

    B.    McDonald's Has Continually Sought to Cut Employee Wages .........13

    C.    Plaintiff and the Putative Class Members Are Employees at McDonald's McOpCo Restaurants or at McDonald's Franchise Restaurants ...............................................................................15

    D.    McDonald's Model Is Designed to Encourage Competition Between and Among Franchisees and McOpCo Stores ...................................19

    E.    The "No Hire" Agreement ..............................................................22

    F.    Other Evidence of a Horizontal Agreement among Competing Franchisees and McDonald's .........................................................25

    G.    The "No-Hire" Agreement Is Against the Independent Interests of the Franchisees and of the McOpCo Restaurants in their Capacity as Competitors ...............................................................................26

    H.    Employment with Non-McDonald's Brands is Not a Reasonable Substitute for McDonald's Employees ..............................................27

    I.    Plaintiff and the Class Members Have Suffered Antitrust Injury.......29

CLASS ALLEGATIONS .................................................................................... 29

CLAIMS FOR RELIEF ...................................................................................... 32

COUNT I: VIOLATIONS OF SECTION 1 OF THE SHERMAN ACT..................... 32

PRAYER FOR RELIEF ..................................................................................... 34

JURY DEMAND ............................................................................................... 35

i

Plaintiff Stephanie Turner, on behalf of herself and all others similarly situated, with knowledge as to her own actions and events, and upon information and belief as to other matters, complains and alleges as follows:

## NATURE OF THE ACTION

1.      This action challenges under Section 1 of the Sherman Act a no-solicitation and no-hiring contract, combination, or conspiracy between and among Defendants McDonald's USA, LLC, McDonald's Corporation (together, "Defendants" or "McDonald's"), and their franchisees, pursuant to which McDonald's and the franchisees agreed not to recruit or hire each other's employees.

2.      McDonald's, at its principal place of business formerly located in Oak Brook, Illinois, was intimately involved in forming, monitoring, and enforcing this anti-competitive contract, combination, or conspiracy.  McDonald's orchestrated, dispersed, and enforced the agreement among itself and all franchisees, at least in part, through an explicit contractual prohibition contained in standard McDonald's franchise agreements.  That standard agreement was executed by McDonald's and by franchisees alike—at least up until sometime in 2017.  The practice at issue reflects a naked horizontal restraint of competition in the form of a market allocation agreement, a category of restraint long held to be *per se* unlawful under the antitrust laws.  The agreement was not reasonably necessary to, and did not contribute to the success of, any legitimate procompetitive benefit or joint venture, nor did it promote enterprise or productivity when it was adopted or at any time since.

3.      Plaintiff and the Class (defined below) are current and former employees of McDonald's-branded restaurants operated by McDonald's or a McDonald's franchisee.  Plaintiff

2

and the Class have suffered depressed wages and benefits and diminished opportunities as a result of the unlawful agreement.

4.  McDonald's is the world's leading global food service retailer with over 36,000 locations in over 100 countries.  More than 80% of McDonald's restaurants worldwide are franchise businesses that are independently owned and operated, and are separate and distinct entities from McDonald's.

5.  In the U.S., approximately 90% of McDonald's restaurants are operated by independently-owned and -operated franchisees who have executed a standard form franchise agreement with either McDonald's USA, LLC or McDonald's Corporation.  Some or all of the remaining U.S. McDonald's restaurants are operated by McDonald's itself.

6.  McDonald's boasts on its corporate website that in the U.S. market, it possesses "a unique and powerful field organization structure that, when optimized, gives us a significant competitive advantage."[1]  McDonald's also considers itself an "iconic brand, moving toward the future" with "commitments to our people, our communities and our world."[2]

7.  As part of McDonald's system to maintain its significant competitive advantage, together with its franchisees, McDonald's has colluded to suppress the wages of the restaurant-based employees who work not only at McDonald's restaurants in Ohio or Kentucky, but also throughout the United States.  In particular, McDonald's and its franchisees have contracted, combined, and/or conspired to neither hire nor solicit each other's employees.  McDonald's effected this plan, in part, through an explicit contractual "no hire" and "no solicitation" clause in

---

[1] Available at http://corporate.mcdonalds.com/mcd/investors/company-overview/company-overview-segment-information.html (last visited September 18, 2017).

[2] Available at http://corporate.mcdonalds.com/mcd/our_company.html (last visited April 1, 2017).

its franchise agreements that expressly prohibits its franchisees from "employ[ing] or seek[ing] to employ any person" who at the time is, or within the preceding six months has been, employed by McDonald's, by any of its subsidiaries, or by any other franchisee. This agreement, which is or was evidenced by express contractual provisions in the standard McDonald's franchise agreement, is an unreasonable restraint of trade.

8.      As further described below, this also is or was not merely a one-way agreement by *franchisees* to not solicit or hire employees away from McDonald's company-owned stores or from other franchisees; rather, *McDonald's itself* adheres or adhered to the same agreement in the operation of its company-owned stores.

9.      As the Department of Justice Antitrust Division and Federal Trade Commission's joint *Antitrust Guidance for Human Resource Professionals* (October 2016) states: "Naked wage-fixing or no-poaching agreements among employers, whether entered into directly or through a third party intermediary, are per se illegal under the antitrust laws."[3] The *Guidance* further elaborates:

> From an antitrust perspective, firms that compete to hire or retain employees are competitors in the employment marketplace, regardless of whether the firms make the same products or compete to provide the same services. It is unlawful for competitors to expressly or implicitly agree not to compete with one another, even if they are motivated by a desire to reduce costs.[4]

10.     The no-hire and no-solicit agreement (hereafter, sometimes called the "No-Poach Agreement") between and among McDonald's and its franchisees has eliminated employers'

---

[3] Available at https://www.justice.gov/atr/file/903511/download (last visited September 17, 2017).

[4] *Id.*

4

incentives and ability to compete for employees, and has depressed employees' wages and restricted employees' mobility.

11.     Consistent with the DOJ/FTC's *Guidance*, the Washington Attorney General concluded in July 2018 that McDonald's No-Poach Agreement constituted an agreement in restraint of trade that "restricts worker mobility and decrease[s] competition for labor by preventing workers from moving among the chain[]'s franchise locations."  The Washington AG also determined that this reduction in competition artificially reduced employee compensation by "put[ting] downward pressure on wages."  In July 2018, McDonald's entered into an Assurance of Discontinuance, pursuant to which McDonald's agreed to stop including the No-Poach Agreement or similar provisions in future franchise agreements, to stop enforcing the No-Poach Agreement in any existing agreements nationwide, and to notify McDonald's franchise operators in Washington of the assurance and to begin amending those agreements to remove the No-Poach Agreement.

12.     Economists have confirmed the Washington AG's findings that no-hire and no-poach agreements, like the one implemented among McDonald's and its franchisees, depress employee compensation by artificially reducing competition in the labor market.  Princeton University economists Alan Krueger and Orley Ashenfelter have studied franchise agreements extensively, and they conclude: (1) that "[a]greements to refrain from recruiting and hiring away employees from other units in a franchise chain are common in franchise contracts;" (2) that those agreements can reduce labor market competition, and reduce workers' job opportunities;

5

and (3) that the prevalence of such agreements may help to explain why wage growth has been sluggish despite low unemployment rates.[5]

13.     Similarly, Joseph Harrington, Wharton professor of business economics and public policy, says, "In terms of suppressing competition, companies agreeing not to compete for each other's employees is the same as companies agreeing not to compete for each other's customers."

14.     According to Peter Cappelli, Wharton management professor and director of Wharton's Center for Human Resources, no-poaching agreements are unfair to employees and such a pact "benefits the companies at the expense of their employees."  Mr. Cappelli notes that the reason such agreements are illegal and violate both anti-trust and employment laws is because "[c]ompanies could achieve the same results by making it attractive enough for employees not to leave."

15.     The collusion of employers to refrain from hiring each other's employees restricts employee mobility and competition in the labor market.  This raises employers' power at the expense of employees and diminishes employee bargaining power for workers within franchise chains.  This is especially harmful to employees of McDonald's and its franchises as those employees are usually paid below a living wage[6], and their marketable skills acquired through their work at McDonald's primarily have value only to other McDonald's restaurants and do not transfer to other fast food restaurants or similar businesses.

---

[5] Alan B. Kreuger and Orley Ashenfelter, *Theory and Evidence on Employer Collusion in the Franchise Sector*, NATIONAL BUREAU OF ECONOMIC RESEARCH (July 2018) at 20-1.

[6] In 2014, the average hourly wage of fast food employees is $9.09 or less than $19,000 per year for a full time worker. The poverty level of a family of four in the U.S. is $23,850.  Patrick M. Sheridan, *Low Wage, health activists prepare McDonald's attack,* CNN Money (May 20, 2014) http://money.cnn.com/2014/05/20/news/companies/mcdonalds-meeting (last visited May 17, 2017).

6

16.     This no-solicitation and no-hiring agreement between and among McDonald's and McDonald's franchisees, pursuant to which McDonald's and its franchisees agreed not to recruit each other's employees (even those employees that approached another McDonald's restaurant for a job on their own volition) eliminated franchisees' and company-owned stores' incentives and ability to compete for employees, and restricted employees' mobility. This agreement, far from being a "commitment to [its] people," instead harmed employees by lowering salaries and benefits employees otherwise would have commanded in an open marketplace, and deprived such employees of better job growth opportunities.

17.     The McDonald's No-Poach Agreement has and had the effect of restraining competition for hiring employees among McDonald's-branded restaurants. It is a restraint of trade that is *per se* unlawful under Section 1 of the Sherman Act, 15 U.S.C. § 1. As a result of the No-Poach Agreement, Plaintiff and the Class suffered antitrust injury in the form of depressed wages.

## THE PARTIES

18.     Plaintiff Stephanie Turner is a resident of Monroe, Ohio. Ms. Turner worked for a McDonald's corporate-operated restaurant in Latonia, Kentucky and then for McDonald's restaurants owned and operated by franchisee Copeland Investments Corporation in Florence and Hebron, Kentucky for a total of approximately 15 years.

19.     Plaintiff has suffered reduced wages, loss of professional growth opportunities, and worsened, illegal working conditions because of the express restraint of trade agreed to between and among McDonald's and its franchisees, prohibiting each from "employ[ing] or seek[ing] to employ" anyone who works (or in the last six months has worked) as an employee at McDonald's, a McDonald's subsidiary, or any other McDonald's franchise. Specifically,

7

Plaintiff Turner was told on numerous occasions that she could not seek jobs with other McDonald's restaurants without first obtaining a release from her current employer. That reduced her mobility within the McDonald's restaurant system and depressed her wages.

20.     Defendant McDonald's USA, LLC is a Delaware limited liability company with its principal place of business in Chicago, Illinois. It is a wholly-owned subsidiary of its parent and predecessor, McDonald's Corporation, which is a Delaware corporation with its principal place of business in Chicago, Illinois. McDonald's is in the business of selling food to customers primarily through independently owned and operated franchise restaurants. It has multiple McDonald's franchise restaurants in Illinois, Kentucky, and every state in the United States. During the period of interest in this lawsuit, it has owned and operated multiple company-owned McDonald's restaurants in Illinois, Ohio, Kentucky, and in approximately 35 other U.S. states and territories.

## CO-CONSIPRATORS

21.     Various other corporations and persons not made defendants in this Complaint, including McDonald's franchisees and the McDonald's operating companies that operate company-owned restaurants, participated as co-conspirators in the violations alleged and performed acts and made statements in furtherance of the violations alleged. Defendants' agents, including their officers, employees, or other representatives, ordered, authorized, or performed the acts alleged in this Complaint on Defendants' behalf in the normal course of their duties as Defendants' agents engaged to manage and operate Defendants' business or affairs. Defendants are jointly and severally liable for the acts of their co-conspirators, whether named or not named as defendants in this Complaint.

## JURISDICTION AND VENUE

22.     This action is instituted under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to recover treble damages and the costs of this suit, including reasonable attorneys' fees, against Defendant for the injuries sustained by Plaintiff by virtue of Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1 and to enjoin further violations. The Court has subject matter jurisdiction under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, under Section 4 of the Sherman Act, 15 U.S.C. § 4, and under 28 U.S.C. §§ 1331, 1332 and 1337 to prevent and restrain the Defendant from violating Section 1 of the Sherman Act, 15 U.S.C. § 1.

23.     Venue is proper in this judicial district under Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22, and 26, and under 28 U.S.C. § 1391(b)(2), (c)(2).  McDonald's transacts or has transacted business in this district and has its principal place of business here. Based on information and belief, a substantial part of the events that gave rise to this action occurred here, namely, the decision to implement the no-solicit and no-hire contract, combination, or conspiracy, the drafting of the no-solicit and no-hire clause in the franchise agreements, McDonald's entry into that agreement, and the selection of Illinois law to interpret and govern that agreement. McDonald's standard franchise agreement states that the provisions and terms of the agreement are to be interpreted in accordance with and governed by the laws of the state of Illinois.  It specifies that all notices are to be directed and delivered to McDonald's address at its principal place of business, in this district.

24.     McDonald's is in the business of selling food to consumers, in part, through independently owned and operated franchise restaurants.  These restaurants are in each state in the United States, and McDonald's has substantial business activities with each franchised

9

restaurant, including entering into a contractual franchise agreement with the owner of the franchise.

25.     McDonald's also sells food to consumers through its own company-owned stores. These restaurants are owned by McDonald's Operating Companies ("McOpCo's"), which are indirect or direct subsidiaries of Defendant McDonald's Corporation. During the period of interest in this lawsuit, more than 35 U.S. states and territories, including Ohio, Kentucky, and Illinois, have boasted multiple McOpCo McDonald's restaurants. Hundreds of McOpCo McDonald's restaurants have operated in the U.S. every year since 2010. McDonald's engages in substantial business activities with the McOpCo restaurants.

26.     McDonald's engages in substantial activities at issue in this Complaint that are in the flow of and substantially affect interstate commerce.

## FACTS COMMON TO ALL COUNTS

### A.     The McDonald's Model:  "Freedom Within A Framework"

27.     McDonald's is one of the world's largest restaurant chains, serving approximately 68 million customers daily in 120 countries across approximately 36,899 outlets.  McDonald's primarily sells hamburgers, cheeseburgers, chicken products, french fries, breakfast items, soft drinks, milkshakes, wraps, and desserts.

28.     A McDonald's restaurant is operated by either a franchisee, an affiliate, or, in the case of company-operated stores, by a McOpCo. McDonald's revenues come from the rent, royalties, and fees paid by the franchisees, as well as from sales in the McOpCo restaurants.

29.     Currently, McDonald's has franchised approximately 90% of its U.S. restaurants, while the remainder are owned and operated by the company.  Most McDonald's franchisees are subject to a standard 20-year franchise license agreement.

10

30.     Any existing McDonald's franchise agreement entered into (and not later amended or superseded) prior to approximately 2005 is an agreement in which McDonald's Corporation is the franchisor.  Any existing McDonald's franchise agreement entered into since approximately 2005 is an agreement in which McDonald's USA, LLC is the franchisor.

31.     Each franchise is operated by an entity that is a separate legal entity from McDonald's USA, LLC and McDonald's Corporation.  Each franchise is an independently owned and independently managed business.

32.     In McDonald's ownership and operation of the McOpCo company-owned restaurants, McDonald's acts as a competitor of independently-owned and -operated McDonald's franchisee restaurants.

33.     There are approximately 420,000 employees that work for McDonald's or its franchise restaurants in the United States.  McDonald's had a net income of $4.686 billion for the fiscal year 2016.  McDonald's current valuation is over $90 billion.

34.     According to a BBC report published in 2012, McDonald's franchises are the world's second largest private employer, with 1.5 million employees working for franchises.

35.     According to *Fast Food Nation* by Eric Schlosser (2001), nearly one in eight workers in the United States has at some time been employed by a McDonald's restaurant.

11

36.     Overall, franchising is very important to McDonald's profitability.  The chart below illustrates the margins McDonald's receives from this part of its business:

### Franchised margins

| In millions | 2012 | 2011 | 2010 |
|---|---|---|---|
| U.S. | $ 3,594 | $ 3,436 | $ 3,239 |
| Europe | 2,352 | 2,400 | 2,063 |
| APMEA | 924 | 858 | 686 |
| Other Countries & Corporate | 567 | 538 | 476 |
| Total | $ 7,437 | $ 7,232 | $ 6,464 |
| | | | |
| Percent of revenues | | | |
| U.S. | 83.9% | 83.9% | 83.4% |
| Europe | 79.0 | 79.1 | 78.2 |
| APMEA | 88.8 | 89.5 | 89.3 |
| Other Countries & Corporate | 85.6 | 86.1 | 86.0 |
| Total | 83.0% | 83.0% | 82.4% |

37.     In McDonald's operated restaurants/franchises, the company develops and refines operating standards, marketing concepts, and product and pricing strategies.

38.     McDonald's also regularly leases to the franchisee the property where the McDonald's franchise is operated.

39.     McDonald's license agreements and operator's lease agreement both provide that the franchisees are independent of McDonald's and are responsible for all obligations and liabilities of the business, and responsible for the day-to-day operations of the business.

40.     The franchise agreement specifies that McDonald's franchisees have no exclusive, protected, or territorial rights in the contiguous market area of their restaurant location(s).  Franchisees are informed and McDonald's discloses that franchisees may face

12

competition from other franchisees, new franchisees, and new McDonald's restaurants owned and operated by McDonald's itself.

41.      Franchise agreements entered into with McDonald's franchisees before at least March 2017 included express language that contractually prohibited franchisees from employing, or seeking to employ, any person who is at the time employed by McDonald's, any of its subsidiaries, or any of its other franchises, unless the employee has left that employment for a period in excess of six (6) months. The same franchise agreements contractually prohibited franchisees from inducing, directly or indirectly, such persons to leave such employment.

42.      McDonald's has treated this as a bilateral prohibition, precluding McDonald's company-owned stores from hiring persons employed by franchisees.

**B.      McDonald's Has Continually Sought to Cut Employee Wages**

43.      Since the late 1990s, McDonald's has continually attempted to reduce labor costs. This included replacing employees with electronic kiosks which would perform actions such as taking orders and accepting money. In 1999, McDonald's first tested "E-Clerks" in suburban Chicago, Illinois, and Wyoming, Michigan, with the devices being able to "save money on live staffers" and attracting larger purchase amounts than average employees.

44.      A study conducted by Anzalone Liszt Grove Research and released by *Fast Food Forward* showed that approximately eighty-four percent (84%) of all fast food employees working in New York City in April 2013 had been paid less than their legal wages by their employers.

45.      From 2007 to 2011, fast food workers in the U.S. drew an average of $7 billion of public assistance annually resulting from receiving low wages.

13

46.     Because McDonald's franchise employees were paid less than a living wage, McResource, the McDonald's intranet website, advised employees to break their food into smaller pieces to feel fuller, seek refunds for unopened holiday purchases, sell possessions online for quick cash, and to "quit complaining" as "stress hormone levels rise by 15 percent after ten minutes of complaining."[7]

47.     In December 2013, McDonald's shut down the McResource website amidst negative publicity and criticism.

48.     The *Roosevelt Institute* accuses some McDonald's restaurants of actually paying less than the minimum wage to entry positions due to "rampant" wage theft.[8]

49.     For example, in South Korea, McDonald's pays part-time employees $5.50 per hour and is accused of paying less with arbitrary schedules, adjustments and pay delays, thereby taking full advantage when there are little to no legal protection of employees.

50.     In late 2015, anonymous aggregated data collected by *Glassdoor* concluded that McDonald's pays entry-level employees in the United States between $7.25 per hour and $11 per hour, with an average of $8.69 per hour.  Shift managers are paid an average of $10.34 per hour. Assistant managers are paid an average of $11.57 per hour.

51.     In 2015, McDonald's CEO, Steve Easterbrook, earned an annual salary of $7.9 million, a 368% raise over his 2014 salary; all while low-wage McDonald's workers were

---

[7] Susanna Kim, *McDonald's Defends Telling Workers to 'Quit Complaining' to Reduce Stress*, ABC News (November 21, 2013) http://abcnews.go.com/Business/mcdonalds-defends-employees-tips-deemed-offensive-clueless-sdovcacy/story?id=20954354 (last visited April 1, 2017).

[8] Harmony Goldberg, *How McDonald's gets away with rampant wage theft,* Salon, (April 6, 2015), http://www.salon.com/2014/04/06/how_mcdonalds_gets_away_with_rampant_wage_theft_partner/ (last visited April 1, 2017).

striking around the world for a livable income.

52.     McDonald's workers have on occasion decided to strike over pay, with most of the employees on strike seeking to be paid $15.00.  McDonald's has helped franchise owners beat back union-backed strikes calling for living wages.

53.     When interviewed about the strikes, former McDonald's CEO Ed Rensi argued that increasing employee wages would take away from entry-level jobs: "It's cheaper to buy a $35,000 robotic arm than it is to hire an employee who's inefficient making $15 per hour bagging french fries."[9]  McDonald's attitude towards working conditions is not much better than its attitude toward wages.  In March 2015, McDonald's workers in 19 U.S. cities filed 28 health and safety complaints with OSHA, which allege that low staffing, lack of protective gear, poor training and pressure to work fast have resulted in injuries.  The complaints also allege that, because of a lack of first aid supplies, workers were told by management to treat burn injuries with condiments such as mayonnaise and mustard.

54.     Despite the objections of McDonald's, the term "McJob" was added to Merriam-Webster's Collegiate Dictionary in 2003.  The term is defined as "a low-paying job that requires little skill and provides little opportunity for advancement."[10]

**C.      Plaintiff and the Putative Class Members Are Employees at McDonald's McOpCo Restaurants or at McDonald's Franchise Restaurants**

55.     Like other fast food chains in the industry, McDonald's restaurants maintain teams of staff in order to oversee operations and guide entry-level employees through daily

---

[9] Kate Taylor, *McDonald's ex-CEO just revealed a terrifying reality for fast-food workers*, Insider (May 25, 2016), http://www.businessinsider.com/mcdonalds-ex-ceo-takes-on-minimum-wage-2016-5 (last visited April 1, 2017).

[10] Available at https://www.merriam-webster.com/dictionary/McJob (last visited September 18, 2017).

responsibilities.

56.     Specific job titles falling under the category of "management" include shift or swing manager, assistant manager, and store manager.

57.     Swing managers may work part-time or full-time, depending on the needs of the specific location.

58.     Assistant managers and store managers usually work full-time schedules of 40 hours or more per week.  Processing payroll, updating time sheets, demonstrating protocol, tracking supply and shipment orders and communicating with the company regional offices are additional job duties of assistant and store managers.

59.     Wages and salaries for employees of franchised stores are not dictated in any way by McDonald's, but average pay scales start out at $8.00 per hour for inexperienced shift managers and eventually rise to roughly $12.00 per hour for highly qualified or tenured shift managers.

60.     Assistant manager positions yield annual salary options slightly varied by location but usually falling between $20,000 and $30,000.

61.     Store managers may begin at $30,000 per year and receive raises or pay increases.

62.     Each franchise (and McDonald's itself, for the McOpCo restaurants) is its own economic decision-maker on employment issues, so wages are not uniform among the competing franchisee and McOpCo stores.  Low wages, however, are consistent across the McDonald's empire of company and franchise-owned restaurants, and have allowed McDonald's shareholders and executives, and thousands of its franchise owners, to become very wealthy while full-time, hardworking employees have to seek government benefits just to put food on their own tables.  A significant reason that gross inequity exists between McDonald's and

16

franchise owners on the one hand, and their employees on the other, is that McDonald's has stifled employee wages through its no-hire prohibition.

## PLAINTIFF TURNER

63.     Ms. Turner began working for a McOpCo restaurant in Latonia, Kentucky in approximately 2000 or 2001.  She began her work in an entry-level crew position earning around $5.35 an hour.  Approximately one year later, Ms. Turner was promoted to Swing Manager, a role she maintained until about 2005, earning up to approximately $9-10 per hour by the time she left.  As a Swing Manager, her duties included preparing lineups of crew people, pre-shift preparation (checking stock levels and verifying safety and cleanliness issues), overseeing employee breaks, counting down cash drawers, counting nightly inventories when closing, and ensuring that the store ran at an acceptable level, consistent with McDonald's-specific training and procedures.

64.     In 2005, Ms. Turner applied for a promotion to become an Assistant Manager, because she aspired eventually to become a General Manager.  However, the promotion was given to a different candidate, a man who was several hours late to his interview.  The experience disillusioned Ms. Turner.  She felt that the chances for advancement at McDonald's were slim, so she decided to leave, and in fact left.

65.     In or around November 2006, Ms. Turner ran into one of her former McDonald's managers, who told her that a new McOpCo restaurant would be opening soon and invited her to apply for a position there.  Ms. Turner applied and was hired to the new location in Wilder, Kentucky as a Swing Manager, but was soon transferred back to the McOpCo in Latonia.  She frequently performed the duties of a First or Second Assistant Manager, such as overseeing truck orders, counting inventory, ensuring that employees took their breaks, and so on, consistent with

17

McDonald's-specific training and procedures. During this time, Ms. Turner earned approximately $10-11.25 an hour.

66. In or around 2009 or 2010, Ms. Turner began to consider applying to a franchise-owned McDonald's restaurant in Florence, Kentucky, approximately five miles closer to where she lived at the time. However, her supervisor at the McOpCo restaurant told her she could not be hired at a franchisee-owned McDonald's without a release unless she first stopped working at the McOpCo for six months. The supervisor also informed Ms. Turner that the franchisee would not be permitted to speak with her without a release from the McOpCo. Ms. Turner understood that, if she asked for a release, her supervisor would not give it to her. Because of the no-poach rules, Ms. Turner did not have the freedom to apply to the Florence location. If she had been offered and accepted a position there, she would have at the very least saved money associated with transportation to the more distant McOpCo restaurant. The fact that she could not even apply also contributed to downward pressure on her own wages at the McOpCo, as she could not use a competing offer to negotiate better wages or benefits at the McOpCo restaurant.

67. Ms. Turner eventually left her position as Swing Manager in Latonia on or around March 3, 2012. On or around September 25, 2012, Ms. Turner began working at a McDonald's restaurant in Florence, Kentucky, owned and operated by the franchisee Copeland Investments Corporation, as a Kitchen Department Manager. In this role, Ms. Turner's duties included all Swing Manager duties in addition to placing truck orders twice a week, counting weekly inventories, supervising her crew and assigning them cleaning and maintenance tasks, and reviewing her area of responsibility with the General Manager, all consistent with McDonald's-specific training and procedure. Ms. Turner's wages at Copeland Investments Corporation started at approximately $11.25 an hour.

18

68.     In or around 2016, Ms. Turner was considering moving to Florida for personal reasons.  She mentioned the idea to her supervisor at the Florence, Kentucky restaurant, who told her that she would need a release if she intended to work for another McDonald's restaurant in Florida.  Ms. Turner felt that, because of her supervisor's tone, the supervisor would not grant her a release if she asked.  Ms. Turner ultimately decided not to move to Florida.

69.     In or around 2017, Ms. Turner was considering moving to Louisiana, once again for personal reasons.  She mentioned the possibility to her supervisor, who reminded Ms. Turner that she would not be able to work for a McDonald's restaurant in Louisiana without a release.  Ms. Turner understood that her supervisor would not grant a release if asked.  Ms. Turner ultimately decided not to move to Louisiana.

70.     Ms. Turner continued to work for Copeland Investments Corporation at three of its McDonald's restaurants in Florence, Kentucky and the Cincinnati airport until approximately September 2018, when she moved to Monroe, Ohio.  At the time she left Copeland Investments Corporation, Ms. Turner's hourly wage was approximately $14.00.

71.     Ms. Turner's experience and long-term tenure made her a desirable employee for McDonald's.  On the one hand, she was a proven reliable employee, and on the other hand, her know-how meant she had much to offer McDonald's restaurants, such as techniques to ensure efficient operation and management of its restaurants and other employees.  But because of the unlawful agreement, Ms. Turner's mobility—and her ability to market her McDonald's-related experience—was artificially limited.  These limits constrained competition between and among McOpCo restaurants and franchisee-operated restaurants for Ms. Turner's labor, which caused her wages to be depressed during her employment.

**D.     McDonald's Model Is Designed to Encourage Competition Between and Among Franchisees and McOpCo Stores**

19

72.     While McDonald's implemented policies to actively thwart competition for employees between and among it and franchises in order to suppress employee wages, it otherwise encouraged competition between franchises that benefitted McDonald's and it emphasized that franchisees are independent of McDonald's.

73.     McDonald's public disclosures and agreements with McDonald's franchisees emphasize that McDonald's franchisees operate separately from each other and from McDonald's.

74.     McDonald's standard franchise agreement itself contains a provision with the header "***Franchisee Not an Agent of McDonald's***" (emphasis in original), that characterizes franchisees as "independent contractors." Pursuant to that provision, McDonald's and franchisees agree that, "Franchisee shall have no authority, express or implied, to act as agent of McDonald's or any of its affiliates for any purpose. … Further, Franchisee and McDonald's are not and do not intend to be partners, associates, or joint employers in any way and McDonald's shall not be construed to be jointly liable for any acts or omissions of Franchisee under any circumstances."

75.     Unlike other franchise business models, McDonald's does not permit its franchisees an exclusive geographic territory within which they will not face competition from other McDonald's restaurants, including McOpCo restaurants. The McDonald's Franchise Disclosure Document ("FDD") states at the outset that franchisees "should not have any expectation that the economic and demographic factors that exist at your McDonald's restaurant location will remain constant. In addition, other McDonald's restaurants (including those that we develop in the future) may have an effect on the sales of your McDonald's restaurant, since

20

customers typically patronize various McDonald's restaurants depending on their travel patterns and other factors."

76.    McDonald's FDD specifies that the Franchise Agreement "does not contain any exclusive grant, exclusive area, exclusive territorial rights, protected territory, or any right to exclude, control, or impose conditions on the location or development of future McDonald's restaurants at any time.  You will not receive an exclusive territory."

77.    The FDD further stresses that the franchisee "may face competition from other franchisees, from outlets that we own, or from other channels of distribution or competitive brands that we control[,]" and that "[t]he sales and customer trading patterns . . . . do not represent any continuing franchisee entitlement or expectation.  McDonald's may establish other franchisee or … McOpCo company-owned outlets that may alter customer trading patterns and affect the sales of, and compete with, your location."  The FDD notes that McDonald's reserves the right to use McDonald's trademarks and to sell similar goods and services through "any other channel of distribution."

78.    McDonald's standard franchise agreement itself specifies that the franchisee is authorized to use the McDonald's system (for a specified period of time) only at the particular restaurant specified therein.  It also states that the franchisee has no "'exclusive,' 'protected,' or other territorial rights in the contiguous market area" of the specified restaurant location.

79.    While franchisees are required to pay to McDonald's a percentage of gross sales revenues, franchisees are free to negotiate purchasing terms with approved suppliers and to seek approval of new suppliers.

80.    Franchisees may also compete with each other by allowing customers to use certain credit and debit cards or certain gift cards, neither of which is a system-wide requirement.

21

81.     A franchisee's profitability is a function of a number of inputs, including its cost of labor, which McDonald's specifically identifies as a franchisee operating expense. Franchisees are required to enroll present and future managers at McDonald's training centers, the travel cost and expense of which is borne by franchisees.

82.     According to McDonald's Senior Director of U.S. Franchising, franchisees are responsible for the day-to-day operations of their restaurants, including employment matters and legal compliance.

83.     But for the no-hire agreement, each McDonald's franchise (and McDonald's itself in its McOpCo stores) is its own economic decision-maker with respect to hiring, firing, staffing, promotions and employee wages.  But for the no-hire agreement, each McDonald's franchise (and McDonald's itself) would compete with each other for the best-performing employees.

**E.      The "No Hire" Agreement**

84.     While independent business owners should be encouraged to compete with each other for employees, McDonald's and its franchisees have agreed not to compete among each other for employees.

85.     Franchises are made available on standardized terms, so a franchisee who enters into a franchise agreement knows that the same terms it has agreed to also apply to other franchisees.

86.     Until approximately March 2017, McDonald's and its franchisees entered into express contractual agreements forbidding competition for employees among franchisees and McDonald's company-owned stores.  In particular, the standard language in McDonald's franchise agreements with all franchisees who executed franchise agreements prior to approximately March 2017 includes an express "no-solicit" and "no-hire" provision that

22

prohibits franchisees from hiring employees of other McDonald's franchisees or of McDonald's or its subsidiaries.

87.     The relevant provision from the McDonald's franchise agreement states:

> *Interference With Employment Relations of Others.*  During the term of this Franchise, Franchisee shall not employ or seek to employ any person who is at the time employed by McDonald's, any of its subsidiaries, or by any person who is at the time operating a McDonald's restaurant or otherwise induce, directly or indirectly, such person to leave such employment.  This paragraph [] shall not be violated if such person has left the employ of any of the foregoing parties for a period in excess of six (6) months.

88.     This provision was interpreted and enforced by McDonald's itself as applying not only to franchisee hiring, but also to McDonald's hiring in its company-owned McOpCo stores. Plaintiff Turner was informed by McDonald's supervisors on several occasions, at both McOpCo and franchisee-operated restaurants, that she could not work for other McDonald's locations without a release.

89.     According to the standard franchise agreement, any breach of this no-hire and no-solicitation provision would give McDonald's the right to seek judicial enforcement of its rights and remedies, including injunctive relief, damages, or specific performance.  An uncured breach qualifies as sufficient reason for McDonald's to withhold approval of its consent to any assignment or transfer of the franchisee's interest in the franchise, and repeated breaches could constitute grounds for termination of the franchise.

90.     The no-hire and no-solicitation provision quoted above appeared in the standard McDonald's franchise agreement appended to its 2013 FDD (with "Issuance Date" of May 1, 2013, "as amended October 25, 2013").

91.     The no-hire and no-solicitation provision quoted above also appeared (unchanged) in the standard McDonald's franchise agreement appended to its 2014 FDD,

amended in 2015 (with "Issuance Date" of May 1, 2014, "as amended" on both November 6, 2014 and January 25, 2015).

92.     In 2017, McDonald's removed the no-hire and no-solicitation provision from its standard franchise agreement.  The no-hire and no-solicitation provision is no longer a part of the standard McDonald's franchise agreement appended to McDonald's current FDD.  The first FDD incorporating a franchise agreement that removed the no-hire and no-solicitation provision has an "Issuance Date" of May 1, 2017, "as amended August 1, 2017."

93.     At the beginning of 2017, McDonald's had more than 13,000 restaurants operating under existing franchise agreements.  None of these franchisees executed the form of standard franchise agreement first issued in 2017 that removed the No Poach Agreement.  The franchise agreement executed by each such franchisee included the no-solicitation and no-hire provision quoted above.

94.     Any new provisions of the 2017 standard franchise agreement (including the absence of the express no-hire and no-solicitation provision) do not govern McDonald's contractual franchise relationship with existing franchisees.  Those franchisees are governed by the franchise agreements that they previously executed with McDonald's, typically with 20-year terms.  Execution of a new franchise agreement typically requires the franchisee to pay a new franchise fee (currently $45,000) for a new term, if approved by McDonald's.  The assurance of discontinuance to which McDonald's submitted to settle claims with the Washington AG only requires McDonald's to amend existing agreements with franchisees in the State of Washington.

95.     The franchise agreement itself contains an integration clause stating that the agreement "constitutes the entire agreement between the parties and supersedes all prior and contemporaneous, oral or written, agreements or understandings of the parties."  It states further

24

that nothing in the agreement "is intended to disclaim the representations made in the [FDD] furnished to the Franchisee."

96.     The FDD confirms that there are "No modifications generally" of the agreement, but that operations and training manuals may be subject to change.  Further, "Only the terms of the Franchise Agreement are binding (subject to state law)."  The FDD also specifies that "Internal policies which McDonald's may apply and modify periodically in connection with decisions to develop new restaurants are not part of the Franchise Agreement and do not involve any contract right granted to [the franchisee]."  Franchisees that executed franchise agreements prior to 2017, except with the possible exception of franchisees within the State of Washington, continue to be bound by the terms of those agreements.

## F.     Other Evidence of a Horizontal Agreement among Competing Franchisees and McDonald's

97.     Public corporate filings reveal that McDonald's admits that its success depends in part on its "System's ability to recruit, motivate and retain a qualified workforce to work in our restaurants in an intensely competitive environment" and the "[i]ncreased costs associated" with retaining qualified employees applies to its franchisees.

98.     Employment applications available online for McDonald's restaurants ask applicants whether they have worked for McDonald's before.  That question is separate and apart from the history of employment portion on the application.  This helps the prospective employer easily flag current employees employed by competing McDonald's franchisees or McOpCo stores and prevents violation of the no-hire provision.

99.     The "no-solicit" and "no-hire" agreement embodies norms that are widely accepted across the fast-food industry and familiar to franchisees.  In advising new restaurant

owners on how to hire their first general manager, one industry expert instructs that, "you have to be careful that you do not earn a reputation for stealing other people's employees."

100.     The potential for broader collusion in franchise chains is clearly enhanced when no-poaching agreements are in place.  Collusion is promoted when the no-poach agreements can be easily generated and monitored amongst a concentrated group of competitors who all stand to gain profits from the collusion while maintaining similar costs.

G.     **The "No-Hire" Agreement Is Against the Independent Interests of the Franchisees and of the McOpCo Restaurants in their Capacity as Competitors**

101.     This no-hire provision is short-sighted and ultimately not in the independent interests of the franchisees or the McOpCo restaurants in their capacity as competitors of each other, even though it is in the collective interest of the conspirators as a whole when acting together.  Employees are critical to the success of McDonald's franchisees and McOpCo restaurants.

102.     It is the sales in franchise-operated restaurants that brings the most revenue to McDonald's, so McDonald's profits hinge on the success or failure of its franchisees.  A significant component of making the franchise profitable is hiring qualified, motivated, and superior employees.

103.     Therefore, it is in the independent interest of each McDonald's franchisee to compete for the most talented and experienced restaurant employees.

104.     By adhering to the no-hire agreement, franchisees and McOpCo restaurants artificially restrict their own ability to hire other employees in a manner that is inconsistent with their own unilateral economic interests.  By acting in concert, however, they also artificially protect themselves from having their own employees poached by other franchises or locations

26

that see additional value in those employees, such as their training, experience and/or work ethic. This allows franchisees or McOpCo restaurants to retain their best employees without having to pay market wages to these employees or compete in the market place relative to working conditions and promotion opportunities.

105.    The "no-hire" agreement does not serve the interests of ensuring that McDonald's restaurants produce a quality product.

106.    The "no-hire" agreement does not serve employees because it does not incentivize McDonald's franchisees and McOpCo restaurants to invest in higher wages, benefits, and working conditions.  It also dis-incentivizes employees to perform their best work as their opportunities by doing so are limited.  Alternatively, competition among employers helps actual and potential employees through higher wages, better benefits, or other terms of employment.

107.    The "no-hire" agreement does not serve fast-food customers because it does not incentivize McDonald's franchisees or McOpCo restaurants to invest in training workers to improve the McDonald's food, experience and service.

108.    Consumers can gain from competition among employers because a more competitive workforce may create more or better goods and services.  Furthermore, unemployment is currently low and job openings are at an all-time high, yet wage growth has remained surprisingly sluggish with fast-food workers relying on public assistance to supplement their income.  Higher wages will lessen the strain on public benefits, benefiting all consumers.

### H.    Employment with Non-McDonald's Brands is Not a Reasonable Substitute for McDonald's Employees

109.    Consistent with Plaintiff's experience, online reviews for employment at McDonald's restaurants report that there was little or no way "to advance after working for nearly two years;" "management told [employees] they were easily replaceable;" "advancement

27

never an option" and working at McDonald's offered "no real opportunity for advancement." That is all made possible by the "no-hire" prohibition. If franchisees and McOpCo restaurants had to either pay and promote good employees, or lose them to competitor locations, they would be forced to pay competitive wages and provide competitive promotion opportunities. However, because of the no-hire prohibition, and because the education, training and experience within the McDonald's enterprise are unique to McDonald's and not transferrable to other restaurants, McDonald's franchisees and McOpCo restaurants do not have to compete with non-McDonald's businesses for their employees except at the entry-level position.

110.    Training, education, and experience within the McDonald's system are not transferrable to other restaurants for a number of reasons. McDonald's franchises utilize McDonald's own proprietary computer systems and platforms, including proprietary applications and data systems, which new franchises must purchase through McDonald's approved suppliers. Franchises electronically submit their store financial information to McDonald's via a separate proprietary web-based system. Experience with these systems is of little value to other restaurants.

111.    McDonald's franchises also utilize proprietary store operating procedures, McDonald's methods of inventory control and bookkeeping/accounting procedures, and McDonald's-prescribed equipment. Training is also accomplished through proprietary curricula and systems. According to McDonald's Franchise Disclosure Document, training is designed to provide the "specific skill sets in the various facets of the conduct of a McDonald's restaurant, including such areas as equipment, standards, controls, and leading people." The Disclosure informs that it takes "approximately two years" to complete all of the learning plans from Shift Manager through General Manager.

28

112.     A no-hire agreement like this one reduces workers' outside options and lowers their quit rate, increasing the share of net-returns captured by employers.  Further, a franchise-wide no-hire agreement increases the specificity of human capital investment, as training that is productive throughout the franchise chain can only be used at one franchisee under the agreement.

113.     Plaintiff Turner was not free to work for McDonald's franchisees while employed by a corporate store, and was not free to work for a corporate store or competing franchisees when working for Copeland Investments Corporation, leaving her with very limited mobility to make the most of her McDonald's-specific experience and skills over the course of approximately 15 years.

I.     **Plaintiff and the Class Members Have Suffered Antitrust Injury**

114.     Because of the "no-solicit" and "no-hire" agreement, Plaintiff and the putative class have suffered injury in the form of reduced wages and worsened working conditions.

115.     Suppressed wages due to employers' agreement not to compete with each other is injury of the type the antitrust laws were intended to prevent and flows from that which makes the "no-hire" and "no-solicit" agreement unlawful.

**CLASS ALLEGATIONS**

116.     Plaintiff brings this action on her own behalf, and on behalf of a nationwide class pursuant to Federal Rules of Civil Procedure, Rules 23(a), 23(b)(2), and/or 23(b)(3).

All persons in the United States who are current or former employees and/or managers at all McDonald's restaurants whether operated by McDonald's itself or by a McDonald's Franchisee.

29

117.     The Class and its members shall be referred to herein as the "Class" or "Class Members."  Excluded from the Class are Defendant McDonald's, its affiliates, officers and directors, and the Judge(s) assigned to this case.  Plaintiff reserves the right to modify, change, or expand the Class definition, or to propose Subclasses, on discovery and further investigation.

118.     Numerosity:  Upon information and belief, the Class is so numerous that joinder of all members is impractical; there are over 14,000 McDonald's restaurants in the United States. While the exact number and identities of the individual Members of the Class are unknown at this time, such information being in the sole possession of Defendant and obtainable by Plaintiff only through the discovery process, Plaintiff believes, and on that basis alleges, that there are thousands of Class Members.

119.     Existence and Predominance of Common Questions of Fact and Law:  Common questions of fact and law exist as to all Members of the Class.  These questions predominate over the questions affecting individual Class Members.  These common legal and factual questions include, but are not limited to, whether:

 a.     Defendants engaged in unlawful contracts, combinations, and/or conspiracies in restraint of trade and commerce;

 b.     Defendants' conduct constituted unfair competition;

 c.     Defendants' conduct constituted unlawful, unfair, and fraudulent business acts and practices;

 d.     Defendants violated the Sherman Antitrust Act, 15 U.S.C. §§ 1, *et seq.*;

 e.     Defendants should be required to disclose the existence of such agreements, contracts, combinations, and/or conspiracies;

      f.      Plaintiff and Class Members are entitled to damages, restitution, equitable relief, and/or other relief; and

      g.      The amount and nature of such relief to be awarded to Plaintiff and the Class.

120.    Typicality:  All of Plaintiff's claims are typical of the claims of the Class inasmuch as Plaintiff was a McDonald's restaurant manager/employee (at franchisee and corporate locations), and each Member of the Class either was or is a McDonald's-owned or franchisee restaurant employee/manager subject to the same agreements and rules as Plaintiff. Further, Plaintiff and all the Members of the Class sustained the same monetary and economic injuries of being subjected to artificial suppression of compensation, wages, benefits, and growth opportunity, and the remedy sought for each is the same in which Plaintiff seeks relief against Defendant for themselves and all absent Class Members.

121.    Adequacy:  Plaintiff is an adequate representatives because her interests do not conflict with the interest of the Class that she seeks to represent, she has retained counsel competent and highly experienced in complex Class Action litigation, and she intends to prosecute this action vigorously.  The interests of the Class will be fairly and adequately protected by Plaintiff and her counsel.

122.    Superiority:  A class action is superior to all other available means of fair and efficient adjudication of the claims of Plaintiff and members of the Class.  The injuries suffered by each individual Class Member are relatively small in comparison to the burden and expense of the individual prosecution of the complex and extensive litigation necessitated by Defendants' conduct.  It would be virtually impossible for members of the Class individually to redress effectively the wrongs done to them.  Even if the Members of the Class could afford such

individual litigation, the court system could not. Individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, an economy of scale, and comprehensive supervision by a single court. Upon information and belief, Members of the Class can be readily identified and notified based on, inter alia, Defendants' employment records and franchisees' records.

123. Defendants have acted, and refuse to act, on grounds generally applicable to the Class, thereby making appropriate final equitable relief with respect to the Class as a whole.

## CLAIMS FOR RELIEF

## COUNT I: VIOLATIONS OF SECTION 1 OF THE SHERMAN ACT

## 15 U.S.C. § 1, *et seq.*

(By Plaintiff on Behalf of the Class)

124. Plaintiff, on behalf of herself and all others similarly situated, re-alleges and incorporates by reference the allegations contained in the preceding and succeeding paragraphs of this Complaint, and further alleges against Defendants as follows:

125. Beginning no later than 2013, Defendants entered into and engaged in unlawful contracts, combinations in the form of trust or otherwise, and/or conspiracies in restraint of trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, *et seq*.

126. Defendants engaged in predatory and anticompetitive behavior by restricting competition among and between franchisees and itself in McOpCo restaurants, which unfairly suppressed employee wages, and unreasonably restrained trade.

127.     Defendants' conduct included concerted efforts, actions and undertakings among the Defendants and franchisee owners with the intent, purpose and effect of: (a) artificially suppressing the compensation of Plaintiff and Class Members; (b) eliminating competition among Defendants and franchise owners for labor; and (c) restraining employees' ability to secure better compensation, advancement, benefits, and working conditions.

128.     Defendants perpetrated the scheme with the specific intent of lowering costs to the benefit of Defendants and franchise owners.

129.     Defendants' conduct in furtherance of its contracts, combinations and/or conspiracies were authorized, ordered, or done by their respective officers, directors, agents, employees, or representatives while actively engaging in the management of Defendants' affairs.

130.     Plaintiff and Class Members have received lower compensation from Defendants and independent franchise businesses than they otherwise would have received in the absence of Defendants' unlawful conduct and, as a result, have been injured in their property and have suffered damages in an amount according to proof at trial.

131.     Defendants' contracts, combinations, and/or conspiracies are per se violations of Section 1 of the Sherman Act.

132.     In the alternative, Defendants are liable under a "quick look" analysis where an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets.

133.     Defendants' contracts, combinations, and/or conspiracies have had a substantial effect on interstate commerce.

134.     As a direct and proximate result of Defendants' contract, combination, and/or conspiracy to restrain trade and commerce, Plaintiff and Class Members have suffered injury to

their business or property and will continue to suffer economic injury and deprivation of the benefit of free and fair competition.

135.    Plaintiff and the Class Members are entitled to treble damages, attorneys' fees, reasonable expenses, and costs of suit for the violations of the Sherman Act alleged herein.

## PRAYER FOR RELIEF

Wherefore, Plaintiff, on behalf of herself and Members of the Class, requests that this Court:

A.    determine that the claims alleged herein may be maintained as a Class Action under Rule 23 of the Federal Rules of Civil Procedure, and issue an order certifying the Class as defined above;

B.    appoint Plaintiff as a representative of the Class and her counsel as Class Counsel;

C.    declare that Defendants' actions as set forth in this Complaint violate the law;

D.    award Plaintiff and the Class damages in an amount according to proof against Defendants for Defendants' violations of 15 U.S.C. § 1, to be trebled in accordance with those laws;

E.    award all actual, general, special, incidental, statutory, punitive, and consequential damages and restitution to which Plaintiff and the Class Members are entitled;

F.    grant equitable relief, including a judicial determination of the rights and responsibilities of the parties;

34

G.     grant a permanent injunction enjoining Defendants from enforcing or adhering to any existing agreement that unreasonably restricts competition as described herein;

H.     declare Defendants be permanently enjoined and restrained from establishing any similar agreement unreasonably restricting competition for employees except as prescribed by this Court;

I.     grant judgment against Defendants and in favor of Plaintiff and each Member of the Class she represents, for restitution as allowed by law and equity as determined to have been sustained by her;

J.     declare Defendants to be financially responsible for the costs and expenses of a Court-approved notice program by mail, broadcast media, and publication designed to give immediate notification to Class Members;

K.     award pre-judgment and post-judgment interest on such monetary relief;

L.     award reasonable attorneys' fees and costs; and

M.     grant such further relief that this Court deems appropriate.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Date:   August 15, 2019

Respectfully Submitted,

**STEPHANIE TURNER**

*s/ Derek Y. Brandt*
Derek Y. Brandt (IL 6228895)
Leigh M. Perica (IL 6316856)
**McCune Wright Arevalo, LLP**

35

1807249.4

101 West Vandalia Street, Suite 200
Edwardsville, Illinois 62025
Tel: (618) 307-6116 / Fax: (618) 307-6161
dyb@mccunewright.com
lmp@mccunewright.com

Richard D. McCune*
Michele M. Vercoski*
**McCune Wright Arevalo, LLP**
3281 E. Guasti Road, Suite 100
Ontario, CA 91761
Tel: (909) 557-1250 / Fax: (909) 557-1275
rdm@mccunewright.com
mmv@mccunewright.com


Dean Harvey*
Anne B. Shaver*
Lin Y. Chan*
Yaman Salahi*
Jeremy J. Pilaar*
**Lieff Cabraser Heimann & Bernstein, LLP**
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
415.956.1000
dharvey@lchb.com
ashaver@lchb.com
lchan@lchb.com
ysalahi@lchb.com
jpilaar@lchb.com


Walter W. Noss*
Stephanie A. Hackett*
Sean C. Russell*
**Scott+Scott, Attorneys at Law, LLP**
600 West Broadway, Suite 3300
San Diego, CA 92101
Telephone: 619-233-4565
wnoss@scott-scott.com
shackett@scott-scott.com
sean.russell@scott-scott.com

Michelle E. Conston*
**Scott+Scott, Attorneys at Law, LLP**
The Helmsley Building

36

230 Park Avenue, 17th Floor
New York, NY 10169
Telephone: 212-223-6444
mconston@scott-scott.com

* Applications *Pro Hac Vice* to be submitted

*Attorneys for Individual and Representative
Plaintiff Stephanie Turner*

1807249.4